Case number 19-3023, United States of America versus DeAngelo Tyrone Jenkins appellant. Mr. Axum for the appellant, Mr. Hansford for the appellate. Mr. Axum, good morning. Good morning. May it please the court. Tony Axum representing the appellant, DeAngelo Jenkins. And I'd like to reserve two minutes for rebuttal argument. There was no probable cause to seize the infinity DeAngelo Jenkins was driving on October 24th, 2017. There was no evidence that it was at the location of the shooting and its mere presence in the vicinity and mere association with the crossfire shortly before shots were heard. And its mere presence and mere association with the crossfire many blocks away shortly after shots were heard did not establish a basis for seizing the infinity. Under Ibarra v. Illinois and United States v. DeRay, mere presence at the scene of a crime or mere association with someone who has committed a crime do not provide a basis for a search or seizure of property or person. So let me ask you, Mr. Axum, so I'm clear on your position. You acknowledge that the police had the surveillance information and that witness three and four had provided certain information. Yes, I do. And you acknowledge, I believe, that the infinity SUV appeared to be the same infinity SUV that was in the video surveillance and referenced by the witnesses, is that correct? That is correct. So at that point, this hypothetical I'm asking, with that evidence, what do you think a police officer was authorized to do? Well, I think- Anything. There may be, I think, I guess I would need to clarify when you say that evidence. There is evidence that the infinity was seen at a certain location by, it was actually seen first at First Street in Southeast near Suitland Parkway. And it was next seen on Stanton Road in front of Turner Elementary. And then it was seen turning right onto Alabama. At that point, W-3 does not claim that it sees the infinity with the crossfire any longer. And the crossfire is at 15th and Tanner Place, 15th Place and Tanner Streets. W-3 then also sees the crossfire at an alley across from the scene of the shooting. Again, not the infinity. The next time the crossfire is either picked up on a video camera pole or by W-3 is at Stanton and Suitland Parkway. Now that is five to six blocks and then some distance from the scene of the shooting. So with those facts, with regard to the infinity, those facts don't even raise reasonable suspicion that the infinity was at this location of the shooting or had any involvement with the shooting. Now I- That's why I asked my question the way I did, namely a reasonable police officer having looked at the surveillance, having read the witnesses' statements, could do nothing more than walk by when he saw the infinity and a man in it? No, an officer can always engage a citizen on the street. There's nothing that stops a consensual encounter. There's nothing that stops an officer from talking and asking questions. There's nothing that stops an officer- No, in this case, the officer broke up the infinity SUV. I'm sorry, you broke up right in the middle of that question. No, in this case, the officer saw the infinity SUV. On October 24th. And the passenger window was open. What did he say to the occupant in the driver's seat? I believe that the officer said, this vehicle, I'm seizing this vehicle. I believe the very first thing that the officer did was to seize the vehicle. So to, I guess, return to your question as to what the officer- I understand why you wanna answer my question that way, but I thought the record was a little different. And maybe I'm wrong, but I thought the officer approached the vehicle and there was some conversation and the occupant refused to get out of the car. And I'm not clear here exactly what the officer did, but at some point, the officer put his hand through the open window and unlocked the car door. I believe that's correct. And then, I'm not clear what happened to either. What, pulled the occupant out or the occupant got out when the police officer had unlocked the door? I'm not sure that there's a dispute that the officer forcibly removed Mr. Jenkins from the car. After having asked him to exit the car two or three times?  As I recall, talks about the occupant's reactions to the officer's request to get out of the car. Yes. And puts this in part of the mosaic of what would a reasonable officer having the information we've reviewed do under these circumstances? Well, what I would say is the officer did not have reasonable suspicion to seize D'Angelo Jenkins. When the officer walked past D'Angelo Jenkins, he only had information about the car. And I'd submit that that information didn't, certainly not 52 days later, didn't rise to the level of reasonable suspicion to stop the car, but certainly not probable cause to seize the car. To back up just a little bit with regard to what happens on October 24th, the record evidence is that the detective, and this is from the affidavit, the detective conducted a traffic stop on the Infinity and subsequently ID'd the driver. A traffic stop in and of itself is a seizure. And if it is a traffic stop, if the basis for the seizure is not conduct of a person, but because you believe you have a right to seize the car, then the seizure starts taking place once the officer stops the car. Now, with regard to Mr. Jenkins, if you're going to separate out the stop of Mr. Jenkins, which I'd submit you can't do when someone is in a car, at that point, there is no reasonable suspicion against Mr. Jenkins. There is only, I keep hesitating because I don't think there's reasonable suspicion to stop the car, but I'm not sure that there is a clear standard for seizing evidence. Either evidence is either seized, which requires probable cause, or it's not seized. There's not a standard of reasonable suspicion to seize evidence. There's a standard of reasonable suspicion to seize a person because the person is in the act of committing a crime or has recently committed a crime. And that's where the timing of this becomes a problem for the government too, because if the officers had reasonable suspicion with regard to the infinity, the infinity is not a person, the infinity cannot commit a crime. So I'm at a loss for what they could do with that reasonable suspicion on the infinity. All they can do is seize the infinity, which then requires probable cause. So if they had reasonable suspicion for the infinity, they could not do anything with regard to Mr. Jenkins. They don't have reasonable suspicion for him. They don't have probable cause for him. But we do know, again, to return to October 24th, the first thing the officer says, and the record evidence is undisputed, is that he conducted a traffic stop. He didn't conduct a traffic stop of Mr. Jenkins and the car separately. He did both at the same time because of his suspicion about the car, which means that it had to be a seizure of the car when he initiated that stop. And any interaction with Mr. Jenkins was subsequent to that seizure and could not be a basis for justifying that seizure. So whether the officer reached into the car or not, whether Mr. Jenkins refused to get out or not, should not enter into the equation of whether there was probable cause to seize the car as the officer walked by. Now, if the court asks, like what is a reasonable officer to do? A reasonable officer, as I said, could walk up to Mr. Jenkins and ask questions. This is not a situation of escalating suspicion on October 24th. This is a situation in which the officer from the beginning intended to seize the car. So the officer did not walk up and ask questions and did not do what we would call investigation. The officer immediately implicated Mr. Jenkins' Fourth Amendment rights and Mr. Jenkins' Fourth Amendment rights with regard to himself and with regard to his possession of the Infiniti. And if that all flowed through the Infiniti, then the officer needed probable cause to conduct a stop. Mr. Axelrod, from the officer's perspective, this vehicle was associated with another in a tandem driving arrangement that may or may not have involved them in the shooting, but gave rise to reasons who, at least as you said, reasonable suspicion about the vehicle. But bear in mind that the crime in question here involved guns, involved the shooting. I'm not sure why that doesn't make an officer reasonably able to say that we've got cause to stop the vehicle and it's reasonable to be concerned about the individual as well. Well, the first thing I'd say is that it's 52 days later and- Well, that was not part of any of your analysis. Well, you mentioned it once, but that's not key to your reconstruction of the sequence of the events. You made an argument independent of the stale argument, staleness argument. I'm sorry, I don't follow you. I think, I thought you were making an argument about the precise sequence that unfolded here and whether there was probable cause or even reasonable suspicion, or at least reasonable suspicion at the time that the encounter began. On October 24th. Without regard to the 52 days, all right? Well, I think it's difficult. No, I have always incorporated the 52 days into this analysis. Okay, all right. I think it's difficult not to because time is always a question. The reason in the reasonable suspicion, any reasonable suspicion case, that reasonable suspicion doesn't last forever is obvious because that's an expansion of the Fourth Amendment that is not found in the text or in any case law. Is it reasonable to think that whomever is driving a car now was probably driving the same car at some earlier time? No, no, that's not a reasonable assumption. It's not based in fact. It's a possible- It's not based on time and experience? It's a possible inference, but- I think I may have lost your sound. No, no, I'm sorry.  But reasonable suspicion from its inception is an exception to the Fourth Amendment. Anytime the Fourth Amendment is implicated, anytime your privacy rights are implicated, a warrant is required. But in Terry v. Ohio, the Supreme Court said that, and a sense of urgency and exigency permeates Terry v. Ohio because the officer at the time witnesses three, maybe four men, but at least some people casing a business and sees them walk back and forth 24 times. But would you not agree that the Terry analysis has been applied in additional circumstances? And I thought what Judge Ginsburg was getting at was this notion that you have the surveillance information. And my initial question was premised sort of on the notion that it's the identical vehicle that's shown in the surveillance. So you say, well, he would go up and chat with the occupant. Even if it's not reasonable to assume the occupant 52 days later is necessarily the same person. You have the traffic stop. The vehicle can be an instrumentality of a crime. You say he could talk to the person and there, why not reasonably approach with caution given that the crime involved guns, violent shootings, and maybe the occupant can provide some information to assist the officer in carrying out the investigation. And when the driver reacts the way he does, he won't even get out of the car. Why isn't that enough to cause the officer's suspicions to be heightened? Your Honor, I'm not saying that the officer couldn't have suspicion. No, my question is more than suspicion, heightened suspicion. You know, we have all these cases about the prospective defendant acted nervously or answer the questions directly. And that's been a part of the Fourth Amendment analysis. And I think you have to deal with it, don't you? Yes, certainly. All of this assumes, and if I'm forced to assume, if this is the hypothetical and I'm forced to assume that the infinity participated in the shooting, then yes, the officer would have reasonable suspicion. He would have heightened suspicion when he came up to the car, if the defendant acted nervous. I'd submit that the seizure takes place, however, at the traffic stop. So the seizure has already occurred. And everything that flows after the seizure occurs cannot justify the seizure itself. So in claiming that the officer conducted a traffic stop, I understand the court's concern, but at that point, Mr. Jenkins has been stopped and the car has been seized. So any nervousness, any interactions with the officer can't be used as the basis to justify the seizure. The only thing that can be used as the basis to justify the seizure is what happened on September 2nd, 2017. And we know that on September 2nd, the infinity was with the crossfire for a number of minutes during that day. At the crucial moments, the infinity- Let me interrupt you. Judge Rogers, have you had your question answered or can you continue it if we give him some reply? I'm fine, thank you. I would like one second if I may, Judge Henderson. Sure. Seems to me that Mr. Axsom, you're ignoring and we have not raised until now the point that Mr. Jenkins' sister, if I remember correctly, had already told the police that he was the exclusive driver of that vehicle. I understand. Well, they now have the vehicle. They have the information that there's only one person who drives the vehicle. Does that change anything? I'm not sure that that before stopping the vehicle, that it adds to the equation that Mr. Jenkins was the person who could be stopped. Well, the vehicle was involved in this tandem driving and may be in a crime. And the vehicle's associated with only one driver. We can let it go with that. Your Honor, I hate to like argue this, but I'm having difficulty assuming it is an assumption that only one person drives it. She said she hadn't spoken to her brother in over a month. She said he was the driver of the vehicle, but that information, even if true, was not criminal. Driving a car is not criminal. I understand that, but whatever suspicion attaches to the car now reasonably attaches to whomever is driving it, because we now have reason to believe that whomever is driving it is the same person who was driving it in the tandem driving incident. Okay, so that's all I was saying. All right, okay. Let me, we'll give you a couple minutes, Mr. Axon. Mr. Hansford, good morning. Good morning, and may it please the court, Eric Hansford for the United States. There are two alternative and independent grounds to affirm the district court's decision to deny the motion to suppress in this case. First, as we've been discussing this morning, the police had probable cause to seize the Infiniti, but second, any taint from the unlawful seizure dissipated by the time of the search, because the search was done under an independent search warrant that was executed in good faith. Well, footnote nine of your brief raises some questions about that, but let me ask you, where in your brief do you discuss the traffic stop? I'm sorry, the traffic stop, meaning what occurs during the course of the traffic stop? No, the traffic stop itself. The fact that there was a traffic stop and what would justify that? And where is that discussed in your brief? So I think that's in footnote two,  that is not properly before the court. This, the defendant below never- Properly before the court. The defendant, it's forfeited, because the defendant below never objected to consideration of the traffic stop before the district court. And indeed, in his own motion to suppress evidence, discussed the course of that traffic stop with no suggestion that there was anything problematic about the traffic stop or that anything would be subject to suppression. And the motion to suppress specifically says he's moving to suppress the two guns and to suppress the buckle warrant. And that's it. And so the district court, there was no argument below that the district court should be precluded from considering any of the evidence learned during the course of the traffic stop. And indeed, during the course of the proceedings, both parties were discussing it. And I think there are other points that seem to be trying to be reopened on appeal that are important to note, which is that defense counsel below expressly conceded, this is on appendix page 140, said, I concede that these vehicles appear to be traveling together. So any suggestion that it's mere happenstance that they happen to be in the same area, that's an express concession that was made below. And the district court, it, I think, relied on the full, properly relied on the full scope of the evidence that was in the affidavits. And what the district court says is the, this is on appendix 179, the parties don't dispute the material facts that are relevant to the defendant's motion. These facts are contained in the affidavits, plural, that were submitted by both the defendant and the government. And so the question before this court at this point is whether the full facts in those affidavits would support probable cause, not whether certain facts can be knocked out on a kind of theory that there wasn't reasonable articulable suspicion. I will say as well on the traffic stop, I think we also discussed this in footnote seven of our brief, it is not clear, the police approach a parked car, they stop behind a parked car, and it is not clear if there's actually a seizure at that point, because it's not litigated below, but the defendant is clearly not, even though there's a show of force, the defendant is not agreeing to that show of force. And so under Hidari D, there is not a seizure until the defendant actually yields to that show of force. And so we don't have anything in the record suggesting,  but I think that has to count against the defendant, given that he didn't raise these issues below. I do want to also note, in addition to this tandem driving, this eight minute, three and a half mile loop around the crime scene, the police did have at least one other crucial piece of evidence before the encounter with the defendant on October 24th, which was that they had tracked down the crossfire, and the crossfire showed multiple bullet strikes in the crossfire. So in other words, this car that they had tracked down and license plate readers did identify these two particular cars, but these cars that they had, that the detectives have tracked down in this case, the first car that they tracked down on suspicion of being involved in the shooting, it did show signs of being involved in some shooting. And so that provided further corroboration that these two cars that they noticed making this unusual loop were indeed the cars rightly seen as subject of suspicion in this case. And I do think under Wesby, it's important to consider the full totality of the evidence that was before the district court. So the fact that there may be an innocent explanation for something, the fact that it's not illegal for the defendant to be driving this particular car. Wesby says the question's not whether there's an innocent explanation, it's not whether a single fact in isolation is gonna provide probable cause. It's looking at the full totality of the circumstances and often individual facts that may on their own not seem particularly significant when viewed as a whole with the rest of the evidence that does create probable cause. We do in addition make the argument that even if there's not probable cause in this case, the independent search warrant that the police obtained dissipates any taint from the seizure of the infinity. And I think this case presents a scenario that's a lot more common in the context of buildings and homes where the police do commonly obtain warrants, but it does apply equally to cars, which is that the police plan to get a warrant to search a place, but in order to maintain the status quo while getting the warrant, they enter without a warrant and secure the premises. And what Murray and Segura and others say is as long as the police were gonna get a warrant anyway, the independent source doctrine dissipates the taint from any illegal entry or seizure. And that's exactly what happened here, which is that the police seized the car, didn't use anything that they saw during the course of the seizure and then obtained an independent warrant based on that. And our brief on pages 46 to 47 cites a number of cases in other circuits that have applied similar reasoning. That the affidavit relied on the defendant's statement that he was homeless. That's right. The affidavit does include that statement. We think that- That's something that the police learned from the first encounter. So that is something that the police learned from the first encounter, but we don't think that flows from the seizure of car. At most, we think that flows from a temporary, reasonable, articulable suspicion seizure of the defendant as part of this traffic stop. The defendant is not arrested on scene and the Supreme Court in Hensley, a 1985 case that we cite in the footnote two says when the police have reasonable articulable suspicion that someone has been involved in a completed felony, the police can temporarily seize that person as part of a traffic stop to investigate that suspicion. So we think the police at least did have that. And in any event, I think that the homeless, the statement that the defendant was homeless is not the kind of straw that pushed us over into, there's no reason to think that is the reason that the magistrate granted the warrant. And the background principle is that the police should not be in a better position from an illegal action, but they also shouldn't be in a worse position, which the Supreme Court explained in Murray. And so there's no rule that they have to kind of scrub any illegal action from a warrant in order for the independent source doctrine to apply. We think that kind of single statement buried at the end of the warrant would not be enough to defeat the independent source doctrine. If there are no other questions, we would ask that this court affirm. All right, thank you. Mr. Axon, why don't you take two minutes? Thank you, Your Honor. I'd respectfully disagree with the government that the independent source doctrine does not require that, allows for something to be scrubbed from the affidavit. The independent source doctrine does not say that. None of the cases say that you simply excise the improper information from the search warrant or the affidavit and then consider the affidavit anew. The cases actually say that the warrant itself must be wholly unrelated or wholly unconnected to the stop, to the seizure. They could not, the case law could not be more clear. So as we lay out in our brief, the independent source doctrine and attenuation doctrines don't apply in this case, primarily because the police needed an independent legal basis to seize the infinity separate from the information contained in the search warrant. And here we know that from the beginning, the police seized the infinity in order to search it. This is just the type of exploratory investigatory work that the Fourth Amendment prohibits. If the police could have gotten a search warrant ahead of time, then they should have gotten a search warrant ahead of time. They should have had a search warrant as the officer was walking down the street and saw the car, as the officer was pulling up in his car and stopped the car. With regard to the government's claim that below we conceded that the cars were traveling together, that's it, page 140 of the appendix. And it is not the only statement that Mr. Venegas, who was representing Mr. Jenkins below made with regard to what he was agreeing to in this case. But he says, yes, your honor, because the video surveillance is clear and the police are able to time it, and I would have no reason to dispute it based on the fact that they have poll cameras at the school and then they have poll cameras leading into the parkway. Given that, then I'm not going to challenge the timing of it. So I can see that these vehicles appear to be traveling together. He links the vehicles traveling together with time, but he doesn't say the vehicles are together the entire time. We know from W-3 that W-3 sees the crossfire  and sees the crossfire directly across the street from the shooting. I would also point out to the court that within the affidavit, the first affidavit itself, as W-3 enters Suitland Parkway, it sees the crossfire behind it. It does not see the infinity with the crossfire behind it as it enters Suitland Parkway. On Suitland Parkway, at Stanton and Suitland Parkway, there is a poll camera that captures the crossfire and the infinity. The crossfire, again, the first affidavit indicates that the crossfire is driving and the infinity accelerates. And the next indication in the affidavit is that the infinity is at Firth Avenue and Suitland Parkway one minute before the crossfire arrives at that location. So the affidavit is actually out of sequence, but the affidavit does say that the crossfire accelerates if you look at the timestamps after the infinity has accelerated. But the only time there is acceleration is on Suitland Parkway, blocks and blocks away from this shooting. And that is the second time that the infinity is seen at all with the crossfire by W3. So it is simply not accurate. It is not accurate, as I laid out in my briefs, that the cars were looping this area together, and it is simply not accurate that they fled the direct scene of a shooting. It is accurate that they drove past- Let me stop you. If there are no more questions, you are way over your time. All right, the case is submitted. Please call the next case.
judges: Henderson, Rogers, Ginsburg